UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

-------------------------------------------------------x

IN THE MATTER OF THE TAX
LIABILITIES OF:

JOHN DOES, United States taxpayers who, at
any time during the years ended December 31,
2006, through December 31, 2014, directly or
indirectly had interests in or signature or other
authority (including authority to withdraw
funds, trade or give instructions or receive
account statements, confirmations or other
information, advice or solicitations) with
respect to any financial accounts maintained at,
monitored by, or managed through Belize Bank
International Limited ("BBIL") or Belize Bank
Limited ("BBL"), or  Belize Corporate Services
Limited ("Belize Corporate Services"), their
predecessors, subsidiaries, and affiliates, and
financial accounts maintained at, monitored by,
or managed through other financial institutions
that BBIL, BBL, or Belize Corporate Services
permitted to transact client business through
their United States correspondent accounts at
Bank of America, National Association or
Citibank, National Association

-------------------------------------------------------x

Case No. _____


**DECLARATION OF
MICHAEL FRAZIER**

     I, Michael Frazier, pursuant to 28 U.S.C. § 1746, declare and state:

     1.     I am a duly commissioned Internal Revenue Agent ("Revenue Agent") assigned

as Technical Specialist in the Internal Revenue Service's (the "Service") Offshore Compliance

Initiatives Program.  The Offshore Compliance Initiatives Program develops projects,

methodologies, and techniques for identifying United States taxpayers involved in abusive

offshore transactions and financial arrangements for tax-avoidance purposes. I have been a

Revenue Agent since 2005, and have specialized in international and offshore tax matters since

that time.  As a Revenue Agent, I have received training in tax law and audit techniques, and have received specialized training in abusive offshore tax issues. I also have experience examining and investigating offshore tax matters.

2.      Since September 2013, I have been assigned to work on the Service's Offshore Private Banking Initiative.  Prior to that, from 2010 to 2013, I was assigned as a coordinator to Revenue Agents examining foreign companies engaged in oil exploration and development activities in U.S. coastal waters as part of the Service's Outer Continental Shelf Compliance Initiative.  As a coordinator, I provided training and technical guidance to the Revenue Agents.  I also conducted research on specific issues and monitored the cases handled by the Revenue Agents.

3.      Prior to that, from 2005 to 2010, I worked as a Revenue Agent on large corporate income tax examinations in the Service's Large-Medium Size Business Division.  As a Revenue Agent, my duties included conducting examinations (audits) of taxpayers to determine their correct income tax liability.  I have conducted examinations that involved transfer pricing issues, foreign tax credits, permanent establishment in the U.S., international corporate restructuring transactions, and foreign asset transfers.   I have conducted penalty investigations involving failures to file information returns such as Form 5471, *Information Return of U.S. Persons With Respect to Certain Foreign Corporations*, Form 8858, *Information Return of U.S. Persons With Respect To Foreign Disregarded Entities*, and Form 8865, *Return of U.S. Persons With Respect to Certain Foreign Partnerships*, and I have assisted other Revenue Agents in similar examinations and investigations.

- 2 -

4.       Prior to joining the Service, I worked for approximately 20 years as a tax accountant and tax manager in public accounting firms and various corporate-tax departments. During this time, I was involved with a number of international and offshore tax matters.  I also have a Master's Degree in Professional Accounting – Taxation, from the University of Texas at Austin, and received a Certified Public Accountant certificate from the Missouri Board of Accountancy in 1990.

## I.       BACKGROUND

### A.       Offshore Tax Avoidance

5.       The Service has long been concerned with the problem of U.S. taxpayers— whether involved in lawful or unlawful activities—evading their U.S. tax obligations by concealing unreported taxable income in accounts in offshore tax haven or financial-secrecy jurisdictions.  That problem has been described in detail in a number of reports, including: Committee on Homeland Security and Governmental Affairs, Permanent Subcommittee on Investigations, Crime and Secrecy: The Use of Offshore Banks and Companies, S. Rep. No. 99-130 (1985); United Nations' Office for Drug Control and Crime Prevention, Global Programme Against Money Laundering, Financial Havens, Banking Secrecy and Money Laundering, (May 29, 1998), available at http://www.imolin.org/imolin/finhaeng.html; and Committee on Homeland Security and Governmental Affairs, Permanent Subcommittee on Investigations, Tax Haven Banks and U.S. Tax Compliance, S. Rep. No. 110-614 (2008).

6.       Since 2000, the Service has conducted thousands of examinations in cases developed through John Doe summonses issued as part of its offshore compliance initiatives. Experience in those examinations has shown that:

- 3 -

13111866.1

a.   Offshore tax evasion almost always involves a foreign financial account.

b.   Offshore tax evasion often involves an offshore entity (e.g., corporation, trust, foundation) or structure of entities.  These entities are typically controlled through nominee directors or trustees, and are used to conceal the taxpayer's beneficial ownership of offshore, and sometimes domestic, accounts and assets.

c.   Taxpayers forming or acquiring offshore entities or structures, or opening offshore bank accounts, often use the services of offshore trust and corporate-service providers who advertise that they do the following:

i.   open bank accounts;

ii.   create corporations, trusts, and foundations; and

iii.   serve as nominee directors, officers, and trustees for the beneficial owner.

d.   Taxpayers with offshore financial accounts often transfer funds to, and receive funds from, their offshore banks through U.S. correspondent accounts maintained by the offshore banks at U.S. banks.

7.   In addition to its examination experience, the Service has received in excess of 50,000 voluntary disclosures from taxpayers with offshore accounts and entities in a series of Offshore Voluntary Disclosure Programs announced as opportunities for taxpayers to self-disclose tax non-compliance involving offshore accounts and arrangements in exchange for limits on their exposure to criminal and civil penalties.  Taxpayers making voluntary disclosures under the Service's recent offshore voluntary disclosure initiatives have reported the use of undisclosed bank accounts in over 600 banks, or branches of banks, in jurisdictions throughout

- 4 -

13111866.1

the world.  Many of these offshore accounts were held through shell companies or trusts, or employed other arrangements to conceal the beneficial owner.  Many used the services of offshore trust and corporate-service providers.

**B.**     **Private Offshore Banking and Correspondent Accounts**

8.     Private banks are banks, or operational units within banks, that specialize in providing financial and related services to wealthy individuals. Private banks primarily provide such services by acting as a financial advisor, estate planner, credit source, and investment manager.

9.     To open an account in a private bank, prospective clients typically must deposit a substantial sum, often $1 million or more. In return for this deposit, the private bank assigns a "private banker" or "client advisor" to act as a liaison between the client and the bank to facilitate the client's use of the bank's wide-ranging financial services and products. Those products and services often span the globe, enabling the client to benefit from services in carefully selected offshore jurisdictions that tout their strong financial-privacy laws.

10.     Offshore private banking practices have received considerable attention in recent years. The Senate Permanent Subcommittee on Investigations issued a report concluding that:

> Most private banks offer a number of products and services that shield a client's ownership of funds. They include offshore trusts and shell corporations, special name accounts, and codes used to refer to clients or fund transfers.

> All of the private banks interviewed by the Subcommittee staff made routine use of shell corporations for their clients. These shell corporations are often referred to as 'private investment corporations' or PICs. They are usually incorporated in [tax haven or financial-privacy] jurisdictions… which restrict disclosure of a PIC's beneficial owner. Private banks then open accounts in the name of the PIC, allowing the PIC's owner to avoid identification as the account holder.

- 5 -

Private Banking and Money Laundering: A Case Study of Opportunities and Vulnerabilities: Hearings before the Senate Permanent Subcommittee on Investigations, S. Hrg. 106-428 at 881-82 (1999) (Minority Staff Report), *available at* http://www.hsgac.senate.gov/download/report-private-banking-and-money-laundering-a-case-study-of-opportunities-and-vulnerabilities.

11.     The Service's experience has shown, however, that private banking relationships are not the only mechanism used by individuals to conceal ownership of funds from taxing authorities and others.  As described in paragraph 7, above, the disclosure of undisclosed bank accounts in over 600 banks, or branches of banks, in jurisdictions throughout the world suggest that offshore account abuses are not limited to private bank accounts.

12.     The use of correspondent accounts by offshore banks for the purpose of accessing U.S. financial markets, and banking customers, is another mechanism for hiding ownership that has received considerable attention.

13.     In 2001, the Minority Staff of the Senate Permanent Subcommittee on Investigations published an investigative report on correspondent banking, explaining:

> Correspondent banking is the provision of banking services by one bank to another bank. It is a lucrative and important segment of the banking industry.  It enables banks to conduct business and provide services for their customers in jurisdictions where the banks have no physical presence.  For example, a bank that is licensed in a foreign country and has no office in the United States may want to provide certain services in the United States for its customers in order [to] attract or retain the business of important clients with U.S. business activities. Instead of bearing the costs of licensing, staffing and operating its own offices in the United States, the bank might open a correspondent account with an existing U.S. bank.  By establishing such a relationship, the foreign bank, called a respondent, and through it, its customers, can receive many or all of the services offered by the U.S. bank, called the correspondent.
>
> Today, banks establish multiple correspondent relationships throughout the world so they may engage in international financial transactions for

13111866.1

themselves and their clients in places where they do not have a physical presence.  Many of the largest international banks located in the major financial centers of the world serve as correspondents for thousands of other banks.  Due to U.S. prominence in international trade and the high demand for U.S. dollars due to their overall stability, most foreign banks that wish to provide international services to their customers have accounts in the United States capable of transacting business in U.S. dollars.  Those that lack a physical presence in the U.S. will do so through correspondent accounts, creating a large market for those services.

Correspondent Banking: A Gateway to Money Laundering: Hearings before the Senate

Permanent Subcommittee on Investigations, S. Hrg. 107-84 at 287 (2001) (Minority Staff

Report), *available at* http://www.hsgac.senate.gov/download/report_correspondent--banking-a-

gateway-for-money-laundering.

       14.    The Correspondent Banking Report went on to describe the dangers of "nested"

foreign correspondent accounts:

> Another practice in U.S. correspondent banking which increases money laundering risks in the field is the practice of foreign banks operating through the U.S. correspondent accounts of other foreign banks. The investigation uncovered numerous instances of foreign banks gaining access to U.S. banks – not by opening a U.S. correspondent account – but by opening an account at another foreign bank which, in turn, has an account at a U.S. bank.  In some cases, the U.S. bank was unaware that a foreign bank was "nested" in the correspondent account the U.S. bank had opened for another foreign bank; in other cases, the U.S. bank not only knew but approved of the practice.  In a few instances, the U.S. banks were surprised to learn that a single correspondent account was serving as a gateway for multiple foreign banks to gain access to U.S. dollar accounts, U.S. wire transfer systems and other services available in the United States.

Id. at 310.

       15.    In the Service's experience, correspondent accounts provide domestic owners of

offshore accounts with a mechanism for accessing those accounts remotely.  Additionally,

offshore banks that utilize correspondent accounts at a U.S. bank may also allow other offshore

13111866.1

banks to use the correspondent account, which increases an individual's ability to conceal his use of undisclosed offshore accounts.

### C.      Corporate Service Providers

16.      It is the Service's experience that individuals seeking to avoid their United States tax obligations through the use of foreign entities are often assisted by corporate-service providers.  Corporate-service providers are intermediaries that are familiar with the entity requirements in one, or multiple, foreign jurisdictions and assist individuals in creating offshore entities and bank accounts.

17.      In discussing how offshore banks and corporate-service providers assist U.S. taxpayers in concealing their ownership of accounts held at foreign banks, the Senate Permanent Subcommittee on Investigations detailed its interview of Sam Congdon, founder and president of Equity Development Group ("EDG"), a promoter of offshore schemes in areas such as Belize and the Bahamas.  Mr. Congdon testified before the Subcommittee in response to a formal request.  See Minority and Majority Staff Report of Permanent Subcommittee on Investigations, Senate Committee on Homeland Security and Governmental Affairs, Tax Haven Abuses: The Enablers, The Tools and Secrecy:  Hearings Before the Senate Permanent Subcommittee on Investigations, at 17 (Comm. Print 2006).

18.      EDG endeavored to be a one-stop shop for clients seeking to establish an offshore structure.  Id. at 17-28.  Through its website, EDG explained the offshore structures that it could create for its clients, such as offshore corporations, referred to as "international business corporations" ("IBCs"), offshore trusts, offshore bank and brokerage accounts, and offshore addresses.  Id.  EDG offered packages to customers that included an offshore corporation in

13111866.1

Belize, an offshore trust in the Bahamas, offshore bank accounts, and offshore mail forwarding for a year.  Id.  Mr. Congdon testified before the Subcommittee that he typically set up a corporation with each trust that he established.  Id.  EDG also sold shelf companies, which are shell corporations that have been in existence for some period of time before they are purchased. Id.  When setting up these trusts and shell corporations, EDG typically used local offshore service companies similar to Belize Corporate Services Limited ("Belize Corporate Services") (discussed below) in Belize, Commonwealth Trust Services in the British Virgin Islands, and IFG Trust Company in Nevis.  Id.

### D. BCB Holdings Limited and Its Subsidiaries

19.    As reported by the Permanent Subcommittee on Investigations in a 2006 report:

> Belize is a small nation on the Caribbean coast of Central America.  It is home to a developing offshore financial industry, including eight offshore banks, one offshore insurance company, 23 trust companies, and 38,471 registered offshore corporations. Officials in the country have reported a recent increase in financial crimes, including bank fraud, forgery, and counterfeiting.

Minority and Majority Staff Report of Permanent Subcommittee on Investigations, Senate Committee on Homeland Security and Governmental Affairs, Tax Haven Abuses: The Enablers, The Tools and Secrecy:  Hearings Before the Senate Permanent Subcommittee on Investigations, at 15 (Comm. Print 2006) (citing International Narcotics Control Strategy Report, Volume II: Money Laundering and Financial Crimes, U.S. Department of State Bureau for International Narcotics and Law Enforcement Affairs, at 92-94 (Mar. 2006)), *available at* http://www.hsgac.senate.gov/download/report-tax-haven-abuses-the-enablers-the-tools-and-secrecy.

13111866.1

### (1)     BCB Holdings Limited

20.     BCB Holdings Limited ("BCB") is a publicly-traded financial-services holding company based in Belize.  According to its website, BCB was formed in 1987 when a group of investors bought the banking assets of Royal Bank of Canada in Belize under the name of a holding company, Belize Holdings, Inc.  Belize Holdings, Inc., changed its name to Carlisle Holdings Limited in 2005, then to BB Holdings Limited in 2006, and finally to BCB Holdings Limited in May of 2009.

21.     BCB is a holding company with no independent business operations or assets other than its investments in its banking and financial-services subsidiaries.  BCB's ordinary shares are currently traded on the Alternative Investment Market of the London Stock Exchange (AIM) under the symbol 'BCB' and on the Bermuda Stock Exchange under the ticker symbol "BBHL BH."

22.     According to BCB's 2010 Annual Report, BCB financial services group consisted of four subsidiaries: (1) Belize Corporate Services, which is incorporated and based in Belize and provides corporates services to clients both domestically (in Belize) and internationally; (2) British Caribbean Bank International Limited, which is incorporated and based in Belize and provides offshore banking services to international clients; (3) Belize Bank Limited ("BBL"), which is incorporated and based in Belize and focuses on domestic commercial and retail banking in Belize; and (4) British Caribbean Bank Limited ("BCB Turks Caicos"), which operates banks in the Turks and Caicos Islands.

23.     On October 26, 2011, BCB completed a reorganization that included name changes to some of its subsidiaries and a demerger (spin-off) of BCB Turks Caicos into

- 10 -

13111866.1

Waterloo Investment Holdings Limited.  As a result of the reorganization, BCB currently operates Belize Corporate Services, British Caribbean Bank International Limited, now named Belize Bank International Limited ("BBIL"), and BBL.

### (2)   Belize Corporate Services Limited

24.    Belize Corporate Services operates a website: http://www.belizecompanies.com. I have visited this website on multiple occasions.  Since my initial visit on February 12, 2014, the website design has been substantially revised.

25.    According to the "About Us" section of its website (accessed on January 28, 2015), Belize Corporate Services was "Initially established as an offshore service provider primarily for Belize International Business Companies," and "is now Belize's leading international financial service provider with a global network of professional intermediary and private customers."  Attached hereto as Exhibit 1 is a print out of Belize Corporate Services's "About Us – Belize Corporate Services" webpage.

26.    Belize Corporate Services's "About Us – Belize Corporate Services" webpage further explains that its services include: Belize and other foreign jurisdiction company formation, assistance with opening offshore bank accounts denominated in several different currencies, assistance with opening online and offline securities brokerage accounts, credit card accounts, debit and pre-paid card services, and virtual office and bookkeeping services. See Ex. 1.

27.    The offerings listed on Belize Corporate Services's website are also reiterated in BCB's 2010 Annual Report, which states that Belize Corporate Services offers foreign corporate formation and administration services in Belize, the British Virgin Islands, Nevis, St. Lucia,

13111866.1

Panama, Seychelles, the Turks and Caicos, Hong Kong, and other jurisdictions. It continues, explaining that "as of March 2010, Belize Corporate Services has over 16,400 companies under management."

28. Belize Corporate Services's website provides links to explain the characteristics of, and download applications for, the Belize IBC (international business company), Belize Trusts, and Belize Foundations. As discussed above, it is the Service's experience that individuals seeking to avoid their United States or other tax obligations employ entities such as IBCs, foreign trusts, and offshore foundations.

29. With respect to IBCs, Belize Corporate Services's "FAQ" section of its website explains that IBCs may be created remotely (i.e., without visiting Belize) and that confidentiality "is one of the many attributes of a Belize IBC." The webpage further explains, "No information pertaining to the identity of directors and shareholders is filed in any public register in Belize. Filing requirements are limited primarily to memorandum and articles of association, name of registered agent and address of registered office." Attached hereto as Exhibits 2 and 3, respectively, are print outs of Belize Corporate Services's "FAQ" and "IBC" webpages.

30. The "IBC" section of Belize Corporate Services's webpage also includes a subsection titled "Belize Ready Made Companies." According to its website, Belize Corporate Services sells ready-made (shelf) IBCs. The shelf companies are already registered and available for immediate purchase. The purchase price increases with the age of the IBC. Belize Corporate Services's "Ready Made Companies" webpage lists 24 shelf companies ranging in price from $3,575 for "Tickle Top S.A." or "Last Chance Corporation" established in 2006, and $3,175 for "Valerie International Holdings" established in December 2007, to $775 for "King of Arms

13111866.1

LTD." or "Angel White S.A." established in 2014.  Attached hereto as Exhibit 4 is a print out of Belize Corporate Services's "Ready Made Companies" webpage, marketing its shelf entities.  It is the Service's experience that individuals seeking to avoid their United States tax obligations often employ shelf entities because the shelf entity's existence prior to the involvement of the taxpayer individual helps conceal the individual's beneficial ownership.

31.     Belize Corporate Services offers virtual office services that include a local telephone number, fax number, and address for use by the client.  Mail and telephone calls can also be forwarded to the client.  Finally, the telephone number can be answered in the IBC's name by an operator.  As explained on Belize Corporate Services's website, "Having a virtual office allows you to indicate a significant physical presence in Belize to demonstrate that the Belize IBC is not only incorporated in Belize, but also carrying on business from within Belize." Attached hereto as Exhibit 5 is a print out of Belize Corporate Services's "Virtual Office Services" webpage.  It is the Service's experience that individuals seeking to avoid their United States tax obligations use such services to conceal their beneficial ownership of the offshore entity.

32.     Belize Corporate Services's ancillary corporate service offerings include tax exemption certificates, preparation of resolutions and other corporate documents, and corporate nominee director and secretary services.  As explained above, it has been the Service's experience that individuals seeking to avoid their United States tax obligations often employ nominees to conceal their ownership of the offshore entity.

33.     Belize Corporate Services's "IBC" section also includes a link to an IBC application (available in portable document format (PDF)).  Attached hereto as Exhibit 6 is a

13111866.1

copy of the IBC application.  The application includes wire transfer instructions for applicants remitting U.S. Dollars.  Those instructions reference a correspondent account at Bank of America under the name The Belize Bank Limited – International Division (account number ****-*-*6058).[1]  Individuals that employed Belize Corporate Services for the purpose of creating an IBC, trust, or foundation, so as to avoid their United States tax obligations, would wire money through this correspondent account.

34.     Finally, Belize Corporate Services's website contains a link discussing "Professional Intermediaries."  Belize Corporate Services's "Professional Intermediaries" webpage provides an opportunity for other corporate-service providers (such as Sam Congdon and EDG discussed above) to partner with Belize Corporate Services and obtain discounted rates and fees on services offered by Belize Corporate Services.  This opportunity expands the reach of Belize Corporate Services's services beyond its direct clients to other, indirect, clients being served by Belize Corporate Services's professional intermediary partners.  Attached hereto as Exhibit 7 is a print out of Belize Corporate Services's "Professional Intermediaries" webpage.

### (3)      Belize Bank International Limited

35.     Belize Bank International Limited ("BBIL") is directly owned by Belize Bank Limited, per the 2014 BCB Annual Report.  BBIL caters to corporate, private, and international clients and offers service on its website that include: multi-currency accounts, certificates of deposit (CDs), wire transfers, credit cards, debit cards, pre-paid Visa cards, merchant services, and loans to corporate institutions and individuals.  BBIL's website— http://www.belizebankinternational.com—has links to bank account, credit card, and loan

---

[1] As discussed below, this is the same correspondent account that is currently maintained by BBIL at Bank of America.

applications, including wire transfer instructions through accounts at correspondent banks. Attached hereto as Exhibit 8 is a print out of BBIL's "Customer Support – Transfer Instructions" webpage showing the various correspondent banks that BBIL works with.

36.     The BBIL website touts Belize's long history of client confidentiality and strict, long-standing bank secrecy laws to ensure the protection of banking records and has links to articles that explain the benefits and drivers of offshore banking.  Attached hereto as Exhibit 9 is a print out of a PDF brochure about BBIL, which is available on BBIL's website.  The brochure, like the website, touts BBIL's client privacy, discretion, and ease of remote account access.  It is the Service's experience that individuals seeking to avoid their United States tax obligations seek out these characteristics in an offshore bank.  Such characteristics allow individuals to conceal their ownership while maintaining easy and remote access to their offshore accounts.

### (4)     Belize Bank Limited

37.     Belize Bank Limited ("BBL") "is incorporated and based in Belize and focuses on the provision of financial services and lending to domestic clients," per the 2014 BCB Annual Report.  BBL's website offers personal banking services that include: consumer loans, home loans, checking and savings accounts, credit cards, and term deposits, wire transfers, debit cards. Corporate banking services include checking and savings accounts, credit cards, term deposits, merchant services, loans, and services to Foreign Businesses.  BBL's website—http://www.belizebank.com—has links to bank account, credit card, and loan applications, and links to the websites of BBIL and Belize Corporate Services.

- 15 -

13111866.1

**E.      The Service's Investigation**

38.      Since 2000, the Service has conducted thousands of examinations in cases

developed through John Doe summonses issued as part of its Offshore Compliance Initiatives

Program.  Experience in those examinations (specifically those examinations involving foreign

or domestic corporate-service providers like Belize Corporate Services) has shown that the

beneficial owner, while claiming to be "removed" from the foreign assets or entities, in fact

retains control over such assets or entities through other means such as a side agreement with the

corporate-service provider.

39.      During my investigation, I reviewed the Service's examination files and

documents of a corporate-service provider, Service Provider-1, that provided offshore services to

clients similar to those provided by Mr. Congdon and EDG.  Through my review, I discovered

multiple instances where clients of Service Provider-1 incorporated a Belize IBC using the

services of Belize Corporate Services as the registrar or nominee director, used the address of

BBL as the corporate address of the Belize IBC, and set up offshore bank accounts at BBIL

owned by the Belize IBC or other foreign entities.  This structure resulted in the concealment of

the client's ownership of accounts held in foreign banks.

40.      Through the review of the Service's examination file of a different corporate-

service provider, Service Provider-2, I learned of situations involving the provision of nominee

directors, the formation of offshore companies and offshore trusts in Belize and other foreign

jurisdictions, offshore bank, brokerage and precious metal accounts, and other administrative

services such as mail forwarding.  These situations included instances where Service Provider-2

made payments or deposits to BBIL using wire transfers and credit cards and used the services of

13111866.1

Belize Corporate Services to incorporate Belizean IBCs.  The formation of these offshore entities was part of a package of services that included the foreign corporation's ownership of bank accounts at BBIL.

41.     My review of documents provided to the Service by a third corporate-service provider, Service Provider-3, included emails and billing invoices for various services. Service Provider-3 provided its clients with bearer shares, certificates of incumbency, articles of incorporation, nominee director services, and the formation of offshore entities in Belize and other jurisdictions.  Service Provider-3 also offered mail forwarding services to clients.  These documents demonstrated Service Provider-3 was billed for the services of Belize Corporate Services to incorporate Belizean IBCs and usage of BBIL's address on corporate documents. The formation of these offshore entities was part of a package of services that included the foreign corporation's ownership of bank accounts and the use of mail forwarding to conceal the ownership of the accounts.

42.     The Voluntary Disclosure Practice is a longstanding practice of the Service's Criminal Investigation Division, and takes timely, accurate, and complete voluntary disclosures into account when the Division is deciding whether to recommend criminal prosecution of a taxpayer to the Department of Justice. It enables noncompliant taxpayers to resolve their tax liabilities and minimize their chances of criminal prosecution. The Voluntary Disclosure Practice requires participating taxpayers to cooperate with the Service in the determination of their correct liability for tax and penalties, but does not specify any particular terms for resolution of tax and penalties.

13111866.1

43.     On March 23, 2009, the Service announced a voluntary disclosure program designed to bring taxpayers using undisclosed foreign accounts or entities as a mechanism to avoid or evade tax into compliance with U.S. tax laws. This program, known as the 2009 Offshore Voluntary Disclosure Program ("2009 OVDP"), ran from March 23, 2009 through October 31, 2009, and covered tax years 2003 through 2008. By entering and qualifying for the 2009 OVDP, taxpayers were required to file all original and amended returns and pay all taxes, interest and predetermined penalties, including a 20 percent offshore penalty.

44.     After the 2009 OVDP closed, the Service opened a second special offshore disclosure initiative known as the 2011 Offshore Voluntary Disclosure Initiative ("2011 OVDI"). The 2011 OVDI ran from February 8, 2011 through September 9, 2011, and covered tax years 2003 through 2010. The objective of the 2011 OVDI was the same as the 2009 OVDP; however, the penalty framework changed and the offshore penalty rate increased from 20 to 25 percent.

45.     The Service began an open-ended offshore voluntary disclosure program in January 2012 ("2012 OVDP") on the heels of strong interest in both the 2009 OVDP and 2011 OVDI.  The 2012 OVDP has a higher penalty rate than the 2011 OVDI and is currently available to taxpayers.

46.     I researched BBIL, BBL[2], and Belize Corporate Services in the Service's Offshore Voluntary Disclosure Program database and learned that, to date, U.S. taxpayers made

---

[2] Based on my research, I determined that although BBIL and BBL are technically distinct entities, they are often used interchangeably in the public sphere.  Historical documents indicate that both banks operated from the same location and used the same operational staff.  Indeed BBIL is being (and has been) marketed as a division of BBL.  See Ex. 6 (referring to BBIL as the "international division" of BBL).  This commingling caused me to research both BBIL and BBL. Through my search I discovered that in some instances, taxpayers referenced BBL as the bank rather than BBIL.  In those instances, I believe that the account was likely held at BBIL rather

13111866.1

at least 20 different voluntary disclosure submissions relating to at least 23 previously undisclosed accounts at BBIL or BBL. I have reviewed these voluntary disclosure submissions, and they involve taxpayers who failed to report income tax liabilities arising from the activity in the undisclosed accounts at BBIL or BBL.

47.     In addition, I personally interviewed five U.S. taxpayers that made voluntary disclosure submissions to the Service.

48.     Taxpayer-1 was the owner of a cargo-brokerage company.  Taxpayer-1 was also the beneficial owner of a Belizean IBC formed on his behalf by a corporate-service provider in Belize.  Taxpayer-1's Belizean IBC opened an account at BBIL remotely through BBIL's website, and at another Belize banking institution.  Taxpayer-1 used the accounts to receive wire transfers from customers of Taxpayer-1's cargo-brokerage business.  Taxpayer-1 had signatory authority over the accounts and requested that statements and other account information not be mailed to Taxpayer-1's U.S. address.  At the time the account at BBIL was opened, Taxpayer-1 provided BBIL with a copy of his United States passport indicating his country of residence.  Taxpayer-1 accessed the account remotely through the internet, fax, and sometimes email from his residence in the United States.  Taxpayer-1 used part of the funds to invest in real estate and construct a vacation home in Belize.  Although Taxpayer-1 was the beneficial owner of the Belizean IBC and its bank accounts, he did not report the Belizean IBC, the ownership of the accounts, or the receipt of the cargo-brokerage income and other interest income on his U.S. tax returns until he made his voluntary disclosure during the 2011 OVDP.

_____

than BBL because the taxpayer was not a Belizean citizen or resident and Belizean banking restrictions limit the ability of a non-citizen or resident to open an account at domestic banks such as BBL.

49.   Taxpayer-2 is a consultant in the petroleum and energy industries. With the assistance of Belize Corporate Services, Taxpayer-2 set up a Belizean IBC to receive consulting income from his international clients. Through the Belizean IBC, Taxpayer-2 established a bank account at BBIL, which was funded with consulting income generated by Taxpayer-2's foreign clients. Taxpayer-2 had signatory authority, beneficial ownership, and control over the funds in the account at BBIL. For the Belize IBC, Taxpayer-2 provided Belize Corporate Services (through the mail) with a copy of his U.S. passport, indicating that his country of residence was U.S.A. Taxpayer-2 also provided Belize Corporate Services bank references and corporate documents. Taxpayer-2 funded the BBIL account through wire transfers. Taxpayer-2 did not report the income, or the ownership of the account, on his U.S. tax returns. He also did not report his ownership of the Belizean IBC on Form 5471 until he participated in the Service's 2011 OVDP.

50.   Taxpayer-3 and Taxpayer-4[3] set up a bank account in the Bahamas in the early 1990s to hide funds from possible malpractice claims related to Taxpayer-3's medical practice. Subsequently, in 2005, Taxpayer-3 and Taxpayer-4 traveled to Belize on a vacation and set up an account at BBL.[4] Taxpayer-3 and Taxpayer-4 transferred the funds from their account in the Bahamas to their account in Belize. Taxpayer-3 and Taxpayer-4 provided their U.S. passport to BBL at the time the account was opened. Taxpayer-3 and Taxpayer-4 had joint signatory

---

[3] Taxpayer-4 is married to Taxpayer-3 and was the joint owner of the relevant offshore bank accounts and filed a joint return with Taxpayer-3. I, however, only interviewed Taxpayer-3.

[4] This account was identified as being held at BBL. As discussed in footnote 2, above, I believe this account was likely held at BBIL rather than BBL. At the time this account was opened, both banks used the same location and operational staff. Because the distinction is primarily a legal one, it is likely that the bank staff did not explain the distinction to Taxpayer-3 or Taxpayer-4 when the account was opened.

13111866.1

authority over the account and Taxpayer-3 requested the bank to hold all mail related to the account. Monies in the BBL account were invested in certificates of deposit. Neither the Bahamian or Belizean bank accounts, nor their earnings, were reported on Taxpayer-3 and Taxpayer-4's U.S. tax returns until their participation in the Service's 2012 OVDP.

51.     Taxpayer-5 is a maritime lawyer who established a Belizean IBC to provide ship registration and brokerage services to international clients. Taxpayer-5 opened an account at BBIL in the name of the Belizean IBC using his U.S. passport and bank references from the United States. Taxpayer-5 opened the BBIL account remotely and managed the BBIL account via telephone. Taxpayer-5 did not have online account access. Taxpayer-5 funded the BBIL account through a wire transfer from U.S.-based accounts. Taxpayer-5 also funded the BBIL account through wire transfers of proceeds from his ship registration and brokerage service business. Taxpayer-5 had beneficial ownership of and complete control over the funds in the BBIL account. Taxpayer-5 did not report the Belizean IBC on Form 5471, nor did he report the BBIL account, or any associated income on his U.S. tax returns until he made his voluntary disclosure in the 2009 OVDP.

52.     Taxpayer-6 was a client of Service Provider-2, and was referred to Belize Corporate Services by Service Provider-2. Belize Corporate Services helped Taxpayer-6 set up a Belizean IBC with accounts at BBIL and a Swiss bank and offered him nominee director services, which he declined. The accounts were in the name of the Belizean IBC, which Taxpayer-6 controlled. These accounts held monies transferred from Taxpayer-6's previously undisclosed bank account in the Jersey Island. The monies had originally been received by Taxpayer-6 as consulting and interest income. The BBIL account included income that was not

- 21 -

disclosed or taxed on Taxpayer-6's U.S. tax returns prior to Taxpayer-6's participation in the Service's offshore voluntary disclosure initiative.

53.     In addition to reviewing the voluntary disclosures, I have researched public records.  Through my research, I have learned of criminal proceedings in the United States in which the defendants used secret accounts at BBIL (or possibly BBL) and concealed criminal proceeds:

    a.   United States v. Taansen Fairmont Sumeru, a.k.a. David Freeston, et al. – In 2005, the U.S. Attorney's Office for the Central District of California obtained an indictment against defendant Sumeru.  The case was filed in Central District of California (Case No. 05-cr-00121).  In 2006 (and in a 2008 retrial), defendant Sumeru was convicted of securities fraud, wire fraud, conspiracy to commit money laundering, and failure to file federal income tax returns for 1999 and 2000.  These crimes were part of a larger operation that involved a Grenadian company, Sattva Investment Bank, which attracted customers by offering high returns and claiming deposits were guaranteed by a sham offshore insurer known as IDIC.  The U.S. District Court juries found that defendant Sumeru and others diverted funds obtained from Sattva investors for their personal use.  Defendant Sumeru laundered some of the criminal proceeds through accounts in Bahamas, Hawaii, and an account at BBIL.

    b.   United States v. Lanas Evans Troxler – In 2005, the U.S. Attorney's Office for the Northern District of Texas obtained an indictment against defendant Troxler.  The case was filed in Northern District of Texas (Case No. 05-cr-00263).  In 2008, defendant Troxler was convicted of one count of corruptly endeavoring to obstruct and impede administration of the internal revenue laws, four counts of attempting to evade and defeat tax, and twelve counts of

- 22 -

assisting in the preparation and presentation of false and fraudulent tax returns. Beginning in November 1997, defendant Troxler set up a complex series of sham offshore entities to create the appearance of foreign-source income.  These entities had bank accounts at a number of Caribbean banks, including BBIL and BBL.  Defendant Troxler also operated a website where he offered customers other offshore services including banking services at BBIL and BBL, among others.  The court found that defendant Troxler and his clients retained full control over their assets, businesses, and income earned from them, and the income was taxable and should have been reported on their respective federal individual and business income tax returns.

> c.   United States v. John Anthony Williams – In 2003, the U.S. Attorney's Office for the District of Oregon obtained an indictment against defendant Williams.  The case was filed in the District of Oregon (Case No. 03-cr-60104).  In 2004, defendant Williams was convicted and sentenced for mail and wire fraud, money laundering, and foreign transportation of stolen money. Defendant Williams was a financial advisor and estate planner who defrauded one of his elderly clients out of more than $400,000.  In an attempt to hide his actions, defendant Williams formed an offshore company in Belize, opened a bank account at BBIL, and wire transferred the stolen funds to the account.

> d.   In re: Robert Edwin Jacobsen – The case was filed in United States Bankruptcy Court for the Eastern District of Texas (Case No. 07-41092).  In 2009, after Jacobsen filed his voluntary bankruptcy petition, the court found that Jacobsen set up shell companies in Belize and bank accounts at BBIL for the purposes of evading creditors and hiding assets.  The court sanctioned Jacobsen under 11 U.S.C. § 105(a), finding that Jacobsen acted in bad faith,

13111866.1

attempted to defraud the court, falsified documents presented to the court, caused materially false pleadings to be filed with the court, and abused the bankruptcy process.

54.     In my experience, persons who use undisclosed foreign bank accounts to hold the proceeds of criminal or fraudulent activity also use these accounts to conceal income from the Service.

### F.     BBIL and BBL's Correspondent Accounts

55.     Paragraphs 56 through 60, below, summarize BBL's and BBIL's correspondent account information.  Based on my research reflected herein, these accounts existed for some period of time during the summons period, which covers the years ending December 31, 2006 through December 31, 2014.

56.     With respect to BBL, information available to the Service indicates that BBL maintained a correspondent account with Bank of America, National Association ("Bank of America") for essentially all of the summons period.  Information available to the Service indicates that the account uses SWIFT Code BOFAUS3N and account number ****-*-*6053. Bank of America is a subsidiary of Bank of America Corporation, which maintains its headquarters in Charlotte, North Carolina.  Bank of America operates banking centers in Florida, including a location at 701 Brickell Avenue, Miami, Florida.

57.     With respect to BBIL, according to BCB's 2010 annual report, BBIL also maintains a correspondent account with Bank of America.  Information available to the Service indicates that the SWIFT Code for this account is BOFAUS3N.  Historical information available to the Service indicates that prior to 2012, BBIL used the same correspondent account used by BBL—account no. ****-*-*6053, discussed above.  This is consistent with my findings about

the historical commingling of the bank names and operations, the marketing of BBIL as a

division of BBL, and the apparent confusion of account holders I interviewed as discussed herein

as to which bank their account was actually at.  In light of this, I believe it is necessary for the

Service to obtain information with respect to BBL's correspondent account at Bank of America

as it may contain information related to BBIL.

58.     Information available to the Service indicates that beginning in 2011 or 2012,

BBIL began using its own correspondent account with Bank of America.  The account uses

SWIFT Code BOFAUS3N and account number ****-*-*6058.  This is the account that is

identified on BBIL's website for wire transfers (see Ex. 8) and is also used by Belize Corporate

Services.  See Ex. 6.

59.     According to BCB's 2010 Annual Report, BBIL and BBL also maintain a

correspondent account at Citibank.  Citibank is a subsidiary of Citigroup Inc., which maintains

its headquarters in New York, New York.[5]  Citibank operates banking centers in Florida,

including a location at  201 Biscayne Boulevard, Miami, Florida.   I have been unable to identify

the SWIFT Code or account number for the BBIL or BBL correspondent account(s) maintained

at Citibank.

60.     Based on my experience, I know that through their correspondent relationships,

BBIL, BBL, and users of their correspondent accounts such as Belize Corporate Services, could

wire funds from Belize to their correspondent accounts at Bank of America and Citibank in the

U.S., and in turn, wire funds from the correspondent accounts to other accounts within the U.S.

or overseas.  BBIL and BBL also had the ability to issue checks drawn on the correspondent

_____
[5] Citibank, National Association, is headquartered in Sioux Falls, South Dakota.

13111866.1

accounts at Bank of America and Citibank.  Checks drawn on a correspondent account function like any check drawn on an account at a U.S. financial institution and could be deposited, or cashed for U.S. dollars, at other financial institutions.    Based on my experience, I know that a correspondent account might also serve as a means of moving funds from the U.S. into a foreign respondent bank—BBIL and BBL in this case.

        **G.**      **The Service's Investigation and the John Doe Summonses**

61.      The Service is now investigating U.S. taxpayers who directly or indirectly held (or hold) interests in, or have signature or other authority over, undisclosed financial accounts at BBIL or BBL, as well as at other banks that BBIL or BBL may have permitted to use their U.S. correspondent accounts, and who have not been or may not be complying with U.S. internal revenue laws that require such taxpayers to report the existence of foreign financial accounts and income earned on those accounts.

62.      To facilitate this investigation, the Service is seeking the Court's permission to serve, pursuant to § 7602 of the Internal Revenue Code (26 U.S.C.), "John Doe" summonses on BBIL and BBL's correspondent banks in the U.S—Bank of America and Citibank.  Copies of the summonses are attached as Exhibits 10 and 11, respectively.

63.      Based on information received by the Service, the persons in the "John Doe" class failed or may have failed to report the existence of foreign financial accounts under their control, failed to report income, evaded income taxes, or otherwise violated the internal revenue laws of the United States.

64.      The correspondent account records requested in the John Doe summons will contain information necessary to identify U.S. taxpayers with undisclosed accounts at BBIL (or

possibly BBL) and at other institutions (such as Belize Corporate Services) that BBIL or BBL

may have permitted to use their U.S. correspondent accounts.  For example, client names and

other identifying information may be contained in payee or note lines, on signature lines, or in

endorsements on checks.  Such information may also appear on payee or note lines, signature

lines, or in endorsements on deposited items, or on originator, beneficiary, or instruction fields

on wire transfer records.

      65.    Because of the heightened risk of money laundering through correspondent

accounts, §§ 312, 313 and 319(b) of the U.S.A. Patriot Act and related regulations impose certain

obligations on U.S. financial institutions such as Bank of America and Citibank that house

correspondent accounts for foreign financial institutions to guard against money laundering. As

explained on page 121 of the Bank Secrecy Act/Anti-Money Laundering Examination Manual

(the "Examination Manual"), published by Federal Financial Institutions Examination Council:

    Due diligence policies, procedures, and controls must include each of the following:

- Determining whether each such foreign correspondent account is subject to enhanced due diligence.

- Assessing the money laundering risks presented by each such foreign correspondent account.

- Applying risk-based procedures and controls to each such foreign correspondent account reasonably designed to detect and report known or suspected money laundering activity, including a periodic review of the correspondent account activity sufficient to determine consistency with information obtained about the type, purpose, and anticipated activity of the account.

The Examination Manual, Foreign Correspondent Account Recordkeeping and Due Diligence—

Overview, *available at* https://www.ffiec.gov/pdf/bsa_aml_infobase/documents/BSA_AML_

Man_2010.pdf.

13111866.1

66. The summons also requests reports produced by Bank of America and Citibank's anti-money laundering system in connection with the due diligence requirements, as well as documents reflecting the results of investigations of such exceptions, including communications to BBIL or BBL, or other users of the correspondent accounts, such as Belize Corporate Services. Such exception reports and investigation results may contain information relevant to the identification of U.S. taxpayers with undeclared accounts at BBIL or BBL, or other institutions using the correspondent accounts.

## II.       THE "JOHN DOE" SUMMONS REQUIREMENTS HAVE BEEN MET

67. As described in greater detail below: (A) the "John Doe" summonses to Bank of America and Citibank relate to the investigation of an ascertainable group or class of persons; (B) there is a reasonable basis for believing that such group or class of persons has failed or may have failed to comply with provisions of the internal revenue laws; and (C) the information and documents sought to be obtained from the examination of the records or testimony (and the identity of the persons with respect to whose tax liabilities the summonses have been issued) are not readily available from sources other than Bank of America and Citibank.

### A.       The Summonses Describe an Ascertainable Class of Persons

68. The proposed "John Doe" summonses to Bank of America and Citibank seek information regarding U.S. taxpayers who, at any time during the years ended December 31, 2006 through December 31, 2014, directly or indirectly had interests in or signature or other authority (including authority to withdraw funds, trade or give instructions or receive account statements, confirmations or other information, advice or solicitations) with respect to any financial accounts maintained at, monitored by, or managed through BBIL, BBL, or Belize

13111866.1

Corporate Services, their predecessors, subsidiaries, and affiliates, and financial accounts maintained at, monitored by, or managed through other financial institutions that BBIL, BBL, or Belize Corporate Services permitted to transact client business through their U.S. correspondent accounts at Bank of America or Citibank.

69.     This class of persons is ascertainable in that the individuals in the class are particularized from the general public by their characteristics of being U.S. taxpayers holding accounts at BBIL or BBL or with other institutions to which BBIL or BBL extend privileges of conducting transactions through their U.S. correspondent accounts such as Belize Corporate Services.

     **B.**    **Members of the "John Doe" Class May Have Failed to Comply with Internal Revenue Laws**

         **(1)**    **Internal Revenue Laws Require United States Taxpayers to Report Income Earned Worldwide, to Disclose All Foreign Financial Accounts, and to File Reports of Certain Foreign Financial Accounts**

70.     United States taxpayers with gross income exceeding the filing requirement must file annual income tax returns reporting their income from all sources worldwide.  Taxpayers who fail to report all income on their income tax returns, including income earned in accounts held overseas, have failed to comply with the internal revenue laws.

71.     United States taxpayers who have a financial interest in, or signature authority over, any foreign financial account must disclose the existence of that account on their federal income-tax returns.  This is done by checking the "Yes" box in response to a question at the bottom of Schedule B, Interest and Ordinary Dividends, which is attached to the U.S. Individual Income Tax Return Form 1040 or Form 1040A.

13111866.1

72.     United States taxpayers who have a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a calendar year are required to file with the Department of the Treasury, for that calendar year, a Report of Foreign Bank and Financial Accounts on FinCEN Form 114 ("FBAR")[6].  The FBAR for that calendar year is due by June 30 of the next calendar year.  It is the experience of the Service that taxpayers who have failed to file FBARs with respect to foreign financial accounts typically have also failed to check the box on Schedule B of the U.S. Individual Income Tax Return Form 1040 (or Form 1040A), disclosing the existence of foreign financial accounts, and have failed to report interest or other income earned with respect to those foreign accounts.

73.     A United States person who receives a distribution from a foreign trust, or who was the grantor of, or transferor to, a foreign trust, or who receives certain large gifts or bequests from certain foreign persons, may be required to file Form 3520, Annual Return to Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts.

74.     A United States person who is treated as an owner of any portion of a foreign trust under the grantor trust rules is responsible for ensuring that the foreign trust files Form 3520-A, *Annual Information Return of Foreign Trust With a U.S. Owner*, and that the required annual statements are furnished to its U.S. owners and U.S. beneficiaries.

---

[6] Effective for 2013, Report of Foreign Bank and Financial Accounts, commonly known as an "FBAR," is now reported on FinCEN Form 114 (a.k.a. FinCEN Report 114).  Prior to FinCEN Form 114, an FBAR was reported on Form TD F 90-22.1.

13111866.1

75.     A United States person may be required to file Form 5471, *Information Return of U.S. Persons With Respect to Certain Foreign Corporations*, if certain conditions are met relating to their ownership interest in a foreign corporation.

> **(2)     The Internal Revenue Service has Reason to Believe that Members of the "John Doe" Class May Have Failed to Comply with One or More Requirements of the Internal Revenue Laws**

76.     The "John Doe" class includes U.S. taxpayers with accounts at BBIL or BBL or at other institutions such as Belize Corporate Services that BBIL or BBL permitted to use their correspondent accounts to transact business in the United States. Based on prior experience and my current investigation, it is reasonable to believe that members of the John Doe class may have failed to comply with one or more requirements of the internal revenue laws.

77.     This conclusion is supported generally be the Service's experience that individuals often use offshore bank accounts as a mechanism to avoid their U.S. tax obligations.

78.     BBIL and BBL's partnership with their sister entity, Belize Corporate Services, also supports this conclusion.  Belize Corporate Services either directly, or indirectly through its professional intermediaries, provides offshore corporate services to clients, including the creation of IBCs, offshore trusts and foundations, virtual office and nominee services.  The Service's experience indicates that individuals using the types of services offered by Belize Corporate Services are often interested in concealing their beneficial ownership of foreign assets or bank accounts and that such concealment may be for the purpose of avoiding U.S. tax obligations. Because Belize Corporate Services's clients typically hold accounts at BBIL as part of their service package, it is reasonable to conclude that individuals seeking to avoid their U.S. tax obligations have accounts at BBIL.

13111866.1

79.     This conclusion is further supported by my current investigation.  During my investigation, I reviewed public records.  Those records indicated instances where individuals held undisclosed bank accounts at BBIL or BBL for criminal or other purposes.  On at least one occasion, the accounts were used to avoid U.S. tax obligations.  See United States v. Lanas Evans Troxler, Case No. 05-cr-00263 (N.D. Tex. 2005).

80.     Additionally, during my investigation, I interviewed five taxpayers that held accounts at BBIL or BBL.  These taxpayers controlled accounts either directly or indirectly through a foreign entity, and failed to disclose such accounts to the Service until their participation in the various Offshore Voluntary Disclosure Programs. Notably, some of these taxpayers had utilized the services of Belize Corporate Services either directly or indirectly through a professional intermediary or other offshore-corporate-service provider.  The fact that these individuals held accounts at BBIL or BBL that were not reported in violation of internal revenue laws makes it reasonable to conclude that other, currently unidentified account holders, are also failing to report their BBIL accounts in violation of the internal revenue laws.

81.     It is the experience of the Service that there is a direct correlation between unreported income and the lack of visibility of that income to the Service.  That is, when the third-party payer of income to a taxpayer is not required (or fails) to report that income to the Service, the taxpayer-recipient of that income is far less likely to report that income on his tax returns.  Such instances are much more common in situations where the taxpayer-recipient is using an offshore account, which in turn, further supports the Service's belief that U.S. taxpayers with undisclosed offshore accounts at BBIL and other institutions that may have used BBIL's or

- 32 -

BBL's correspondent accounts may not be complying with the internal revenue laws requiring them to report income earned on those accounts.

82.    Because it does not know the identities of those individuals within the "John Doe" class, the Service cannot yet examine the income tax returns filed by those U.S. taxpayers to determine whether they properly reported that income.

83.    The information obtained by the Service and discussed in this Declaration suggests that many of the still-unknown U.S. account holders at BBIL and BBL, and customers of Belize Corporate Services, have neither disclosed the existence of their offshore accounts nor reported income earned on those accounts.  Instead, they have likely relied on the lack of third-party reporting to support their decision not to report the existence of those accounts, with the expectation that the Service would not discover the accounts or omitted income.

### C.    The Requested Materials Are Not Readily Available From Other Sources

84.    To my knowledge, and based on my experience, the only repositories of the information sought by the proposed summonses that are readily available to the Service are Bank of America and Citibank, which are the custodians of the records of BBIL's and BBL's correspondent accounts.

85.    In light of the above, the records sought by the "John Doe" summonses are not otherwise reasonably and timely available to the Service.

13111866.1

## III.   CONCLUSION

86.    Based upon the foregoing, I believe that the information sought in the "John Doe" summonses to be issued to Bank of America and Citibank will allow the Service to identify U.S. taxpayers who may have failed to comply with their obligation to report and pay U.S. tax on income earned with respect to financial accounts at BBIL and BBL and at other institutions, such as Belize Corporate Services, using BBIL's and BBL's Bank of America and Citibank correspondent accounts during the years ended December 31, 2006 through December 31, 2014.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.   Executed this 15th day of September, 2015.

MICHAEL FRAZIER
Internal Revenue Agent
Internal Revenue Service

13111866.1